## Mercantile Trust Company of Illinois, Appellee, v. E. H. Kastor, Appellant.

### Gen. No. 20,295.

1. PLEDGES, § 2*—*what constitutes pledge.* Where an agreement stated that a corporation was desirous of "selling" accounts receivable, and that plaintiff agreed "to buy" such accounts as were "acceptable," but such agreement provided that the corporation should pay all "losses" incurred in and about any account in default suggesting that the plaintiff would look to the corporation and not the debtor if the latter should be insolvent or would not pay, and also provided that the corporation should make entries on its books of the sale, and stating that the corporation was financially responsible, it was an agreement for the loaning of money to the corporation upon accounts receivable as security, and not a sale of such accounts.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

220    APPELLATE COURTS OF ILLINOIS.

Mercantile Trust Co. of Illinois v. Kastor, 191 Ill. App. 219.

2. PLEDGES, § 2*—*when pledge distinct from sale.* Provisions of an agreement as to accounts receivable allowing the "buyer" to retain accounts as "security," *held* inconsistent with the idea of a sale of such accounts.

3. PLEDGES, § 2*—*what distinguishes sale from pledge.* Where a corporation "selling" accounts agreed to guaranty all losses, the idea of guaranty was inconsistent with the idea of a sale of the accounts, since it suggested that the plaintiff have additional security for the money advanced for the accounts.

4. CORPORATION, § 448*—*when loan contract ultra vires.* A corporation organized under the General Incorporation Act of Illinois is prohibited from engaging in the business of loaning money (Hurd's R. S., ch. 32, sec. 1, J. & A. ¶ 2418), and such loan is absolutely void.

5. CORPORATIONS, § 443*—*what effect of void agreement.* An action cannot be maintained against a corporation as guarantor of a void agreement.

6. APPEAL AND ERROR, § 1802*—*when reversal without remanding proper.* The Appellate Court may reverse without remanding where the facts are different from the finding of the trial court and are recited in the judgment, and when it reverses for errors of law which cannot be cured on another trial.

Appeal from the Municipal Court of Chicago; the Hon. JOSEPH SABATH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1914. Reversed. Opinion filed January 26, 1915. Rehearing denied February 6, 1915. *Certiorari* denied by Supreme Court (making opinion final).

**Statement by the Court.** On October 8, 1913, the plaintiff, Mercantile Trust Company of Illinois, a corporation, commenced an action of the first class, in contract, against E. H. Kastor, defendant, on his written guaranty in connection with a certain written agreement between the United States Kellastone Company, an Oklahoma corporation with principal place of business at Chicago, hereinafter referred to as the Kellastone Company, and the plaintiff. The plaintiff is an Illinois corporation, organized under the general incorporation act of this State. While by its charter it was authorized, among other things, "to buy, sell, hold and own open acounts * * * and choses in action of any and every kind," it was not authorized to engage

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

in the business of loaning money.   On November 18, 1913, the cause was tried before a jury who returned a verdict finding the issues against the defendant and assessing plaintiff's damages at the sum of $3,140.12. The court instructed the jury that said contract between the Kellastone Company and the plaintiff, introduced in evidence, "is construed by the court as a contract of sale and not a pledge or a loan," to the giving of which instruction the defendant excepted. Judgment for $3,140.12 was entered upon the verdict and defendant excepted, and defendant seeks by this appeal to reverse the judgment.

It was alleged in plaintiff's statement of claim, in substance, that $4,410.32 was due plaintiff from defendant "as guarantor of the contract" between the Kellastone Company and plaintiff, under and by virtue of which contract the Kellastone Company "assigned and sold" to plaintiff certain of its accounts against three different parties, "which accounts remain unpaid by the debtors," and which accounts the Kellastone Company "has *failed to repay,* pursuant to the terms of the agreement aforementioned, after due demand; wherefore, defendant, as guarantor, is liable to pay the *amount of said accounts* to plaintiff." The accounts were set forth in said statement of claim as follows:

"H. A. Jones, Los Angeles, California.

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/26/1913: | 60 To Mdse. | D. & R. G. | | 62651 | $1240.50 |
| 8/28 " | 30 " | " | N. Y. C. | 96551 | 885.00 |

$2125.50

J. O. Davis, Hinsdale, Illinois:

| | |
|---|---|
| 8/27/1913: 30 To Mdse. | 708.07 |

Wolverine Building and Supply Co., Detroit, Michigan.

| | | | | |
|---|---|---|---|---|
| 8/21/1913: | 30 dys To Mdse. Car— | | 95868 | 810.00 |
| 9/2 " | " " " | | 10447 | 640.00 |
| 4 " | " " " | | | 637.50 |

$2087.50

|          | Cr. |          |          |
|----------|-----|----------|----------|
| Cash     |     | $40.00   |          |
| "        |     | 280.00   |          |
| "        |     | 50.75    |          |
| "        |     | 140.00   | 510.75   |
|          |     |          | 1576.75  |
|          |     |          | $4410.32" |

The contract between the Kellastone Company and plaintiff, together with the guaranty signed by defendant and by two other persons (said contract and guaranty being partly printed and partly in writing, and the guaranty being on the reverse side of the paper), were attached to plaintiff's statement of claim as an exhibit and made a part thereof and are as follows (italics ours):

"ARTICLES OF AGREEMENT, entered into at Chicago, Illinois, this second day of September, A. D. 1913, between UNITED STATES KELLASTONE COMPANY, an Oklahoma Corporation, hereinafter designated as first party, and MERCANTILE TRUST COMPANY OF ILLINOIS, an Illinois Corporation, hereinafter designated as second party.

WITNESSETH, That Whereas, first party is desirous of selling to second party, Contracts, Accounts Receivable and Choses in Action, hereinafter designated as Accounts, evidencing shipments of personal property;

Now, THEREFORE, In consideration of the premises the parties agree as follows:

FIRST: Second party agrees to buy the Accounts belonging to first party which *are acceptable to it,* and to pay therefor 99% of the face value thereof on Accounts that are paid within 15 days from date of purchase by second party, and 98% of the face value thereof on Accounts that are paid within 30 days from date of purchase by second party, and for each 30 days thereafter that said Accounts are not paid, the purchase price shall be reduced 1%. Payment to be made

Mercantile Trust Co. of Illinois v. Kastor, 191 Ill. App. 219.

by second party as follows: 77% of the face value thereof upon acceptance by second party; the remainder, less all deductions, to be paid to first party immediately upon payment of any such Accounts to second party; provided, however, that if at the time of any settlement between the parties hereto, *any* of the Accounts purchased hereunder shall be *in Default,* payment of such remainder, while any of the Accounts are in Default, shall be *discretionary* with second party.

SECOND: The term *Default or loss* as used in this contract is construed to mean the non-payment of an Account to second party at maturity; insolvency of the debtor; failure or refusal of a debtor to accept, receive and retain the property evidenced by such an Account. First party agrees to pay to second party *all expenses, attorney's fees and losses* incurred by second party in and about any Account in Default.

THIRD: It is agreed that contemporaneously with the purchase of Accounts, first party shall assign and set over to second party, such Accounts purchased by it, to the end that second party shall be and become subrogated to all of the rights possessed by first party in respect thereto. Second party shall have the right to endorse the name of first party on all evidences of shipments or payment pertaining to Accounts purchased hereunder. First party shall make entries upon its books disclosing the sale to second party of Accounts purchased hereunder, and all records pertaining thereto shall at all times be open to the inspection of the second party.

FOURTH: It is expressly understood that the purchase of Accounts by the second party is made upon representations in writing concerning the financial responsibility *of the first party;* statements of which are to be furnished second party once every calendar year.

FIFTH: First party is hereby given the right to make collections of Accounts purchased by second party and to that extent first party shall act as the Agent of second party. The agency hereby created may be terminated by either party upon written notice. During this agency, first party agrees to transmit and deliver to second party at its offices in Chicago, Illi-

224     APPELLATE COURTS OF ILLINOIS.

Mercantile Trust Co. of Illinois v. Kastor, 191 Ill. App. 219.

nois, on the day of receipt thereof, all evidences of payment of Accounts purchased hereunder in the original form received.

SIXTH: This agreement and all its provisions shall inure to and become binding upon the heirs, executors, administrators, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, The parties hereto have caused these presents to be executed on the day and year first above written.

UNITED STATES KELLASTONE CO., (Seal)

By AARON BODENWEISER, (Seal),

(SEAL)                                                    President

Attest:   J. G. McCONNELL,

Asst. Secretary.

MERCANTILE TRUST COMPANY OF ILLINOIS.

(SEAL)

Attest:   R. W. PEARSON                By A. D. NAST,

Secretary.            ·        President.

The following Guaranty and Waiver is to be signed by individuals.

In consideration of the sum of One ($1.00) Dollar and other valuable considerations paid by MERCANTILE TRUST COMPANY OF ILLINOIS, to each of the undersigned, receipt of which is hereby acknowledged, they and each of them do hereby jointly and severally guarantee to MERCANTILE TRUST COMPANY OF ILLINOIS, its successors or assigns, the full, prompt and faithful *payment, performance* and *discharge* by U. S. KELLASTONE COMPANY, of *each of the provisions and conditions of the agreement on reverse side hereof,* or any *other* instrument *given or executed in pursuance thereof.*

The undersigned hereby jointly and severally waive all notice of default by first party, and waive notice of acceptance of this guaranty of MERCANTILE TRUST COMPANY OF ILLINOIS, its successors or assigns.

IN WITNESS WHEREOF, We have hereunto set our hands and seals this 2nd day of September, A. D. 1913.

AARON BODENWEISER        (Seal)

J. G. McCONNELL            (Seal)

E. H. KASTOR              (Seal)''

Mercantile Trust Co. of Illinois v. Kastor, 191 Ill. App. 219.

The defendant, Kastor, in his amended affidavit of merits, alleged, in substance: (1) That the contract sued upon (on the back of which was defendant's guaranty) is one for the loaning of money and is *ultra vires* the plaintiff corporation; (2) that said contract, being for the loaning of money, is null and void for the reason that plaintiff, as a corporation organized under the General Incorporation Act of this State is prohibited by law from engaging in the "business of loaning money," and that said guaranty is also invalid; (3) that said contract, being for the loaning of money, is usurious; (4) that plaintiff has collected moneys on certain accounts transferred to it subsequent to the execution of said contract and guaranty and applied such collections on accounts transferred to it prior to the execution of said contract and guaranty without authority from defendant; (5) that the amounts claimed to be due on the particular accounts mentioned in plaintiff's statement of claim are incorrect; and (6) that at the time of execution of said contract and guaranty it was agreed between plaintiff and defendant that defendant should not be liable except in the event of ultimate financial loss sustained by plaintiff by reason of its dealings with the Kellastone Company, and after plaintiff had made all reasonable efforts to realize upon the accounts assigned to it.

It appears from the evidence introduced at the trial that just prior to the making of the contract sued upon, dated September 2, 1913, the Kellastone Company, which company was engaged in manufacturing and selling a certain kind of building material, was "hard up" and needed money to run its business, and requested monetary assistance of the plaintiff. At this time the defendant, Kastor, had recently become a large stockholder in the Kellastone Company, though not the owner of a majority of the stock. Prior to the time of his acquiring said stock and prior to the execution of said contract, the Kellastone Company had entered into a

similar contract with plaintiff, with which prior contract Kastor had no connection and under which a number of accounts receivable of the Kellastone Company had been assigned to plaintiff, and it was claimed by plaintiff that, because of certain "duplicated" and "crooked" invoices, it had suffered a loss in the transactions and that the Kellastone Company was indebted to it on said "old" accounts in a large sum. When the Kellastone Company suggested the making of the contract sued upon, plaintiff requested that Kastor, as well as Bodenweiser and McConnell, sign said so-called "guaranty and waiver." Before Kastor would agree to sign the same, he demanded of and received from Nast, president of plaintiff, a letter wherein Nast wrote that "we look to you *only to make good any financial loss* we may suffer on account of our dealings with" said Kellastone Company. Shortly after the execution of the contract sued upon, the Kellastone Company delivered over to the plaintiff various of its accounts receivable, including the accounts mentioned in plaintiff's statement of claim, aggregating, face value, more than $36,000, and on account of which plaintiff paid to the Kellastone Company, in cash, seventy-seven per cent. of the face value of said accounts, and no more. Each time any accounts were turned over to plaintiff, a certain so-called "certificate of indebtedness," describing the accounts, was signed by the Kellastone Company and delivered with the accounts to plaintiff. One of these certificates, introduced in evidence, is dated September 2, 1913, and describes fourteen accounts of the aggregate face value of $11,318. It is therein "certified" that the persons named therein are indebted to the "undersigned" (Kellastone Company) for merchandise sold and delivered in the sums set opposite their respective names. Then follows a tabulation, showing respectively the dates of the bills, the names of the debtors, their addresses, the amounts, and the terms of payment,

whether thirty or sixty days.   Immediately under the tabulation of the accounts, and forming a part of said certificate, is the following:

"For and in consideration of the sum of One Dollar ($1.00) and other good and valuable considerations to the undersigned in hand paid, the receipt whereof is hereby acknowledged, the undersigned hereby sells, assigns and transfers to Mercantile Trust Company of Illinois, a corporation, its successors or assigns, all its right, title and interest in and to the contracts and open accounts above named, together with the merchandise represented thereby and including the right of stoppage in transitu.   The invoices which amount to Eleven Thousand Three Hundred Eighteen and no/100 Dollars ($11318.00) are herewith delivered to Mercantile Trust Company of Illinois.   The undersigned *guarantees* that the moneys due on said contracts and open accounts are correctly set forth in above schedule; that full deliveries have been made on all said contracts and open accounts in accordance with the specifications of the buyer; that there is no contra account against any of them; that the amounts due on said contracts and open accounts as set out in said schedules are not disputed by the debtor and are not past due; that there are no offsets against said accounts or any of them for freight, drayage or other carrying charges, commissions, damages or any other counterclaims of any nature whatsoever; that the amount set out in each item of said schedule is net and that the payment of said item or items is not contingent on the fulfillment of any contracts, past or future, and that entries have been made on its books disclosing the absolute sale thereof to Mercantile Trust Company of Illinois, its successors or assigns. The undersigned further agrees to advise Mercantile Trust Company of Illinois, its successors or assigns, of any occurrence that may in any respect impair or reduce the amount shown to be due from debtors on any of the above named contracts or open accounts.   It further agrees to submit to Mercantile Trust Company of Illinois, its successors or assigns, the original correspondence or other documentary evidence relating to

any of the contracts or open accounts listed above when-
ever requested to do so by Mercantile Trust Company
of Illinois, its successors or assigns.

In consideration of the promises aforesaid, and the
further sum of One Dollar to. the undersigned hereto-
fore paid, the undersigned hereby *guarantees the pay-
ment in full* to Mercantile Trust Company of Illinois,
its successors or assigns, of the above named contracts
and open accounts in accordance with the terms indi-
cated and appearing thereon.

Sep 3, 1913      339.54 —.3% Reg.
                8714.86
                2263.60
                ─────────
                $11318.00

U. S. KELLASTONE COMPANY (Seal)
                    Aaron Bodenweiser.''

Both of the items of the ''Jones'' account, men-
tioned in plaintiff's statement of claim, and the first
item of the ''Wolverine'' account, were included in
said instrument and said accounts were assigned to
plaintiff. Other similar instruments were subse-
quently signed by the Kellastone Company. The
''Davis'' account, mentioned in said statement
of claim, and the second item of said ''Wolverine'' ac-
count were assigned to plaintiff by instrument dated
September 4, 1913, and the third item of said ''Wol-
verine'' account by instrument dated September 12,
1913. The Kellastone Company received from the
plaintiff, in cash, seventy-seven per cent., only, of the
face value of said Jones, Davis and Wolverine accounts,
or the sum of $3,789.22. Subsequently $510.75 was
credited by the plaintiff as having been received in cash
by plaintiff on said Wolverine account, leaving a bal-
ance of money actually paid by plaintiff to the Kella-
stone Company, and not returned to plaintiff on said
accounts, of $3,278.47. Plaintiff, however, about one
month after said accounts were assigned to it, sued to
recover from defendant as guarantor the face value of
said accounts, less said sum of $510.75, or the net sum

of $4,410.32. It does not appear whether said debtors were insolvent or not, and it does not appear that any suit was brought against any of them to enforce the collection of said accounts. As to the Jones account, Mr. Nast, president of plaintiff, testified, in substance, that plaintiff had been trying to collect it but without success, that Jones claimed a set-off and had refused to pay. As to the Davis account, he testified that plaintiff had been unable to locate Davis and that letters written to him had been returned. As to the Wolverine account, he testified that the same was in the hands of plaintiff's attorneys in Detroit and that they reported they were unable to collect the balance. He further testified, in substance, that after ascertaining plaintiff's inability to collect said accounts plaintiff "made demand on the Kellastone Company for the money under the contract"; that both Bodenweiser and Kastor came to plaintiff's office about October 5, 1913; that he (Nast) showed them a notice he had from Jones and requested them to "repurchase" the Jones account; that he asked Kastor to "make good these losses"; that Kastor said that he did not want plaintiff to crowd him and that plaintiff would get its money, as he was good for it; that Kastor kept on giving excuses, but as no money seemed to be forthcoming plaintiff commenced this suit on October 8, 1913.

On the "new" accounts, *i. e.,* those accounts assigned after the making of the contract sued upon and of which the Jones, Davis and Wolverine accounts were a part, Nast testified that in round figures plaintiff had collected about $10,000; that nothing had been collected on said Jones, Davis and Wolverine accounts save as mentioned in the statement of claim; that before the contract sued upon was signed Kastor *verbally* agreed with Nast that plaintiff could take twenty per cent. of the collections made on said "new" accounts and apply that twenty per cent. on the shortage which existed on the "old" accounts, *i. e.,* those

accounts which had been assigned to plaintiff under said prior contract; and that the amount so applied was about $1,500. Kastor, however, denied making any such verbal arrangement with Nast, and the latter admitted that Kastor never gave him any written authority to make such application.

It further appeared from the evidence that between the time the present suit was brought and the trial thereof, the Kellastone Company had gone into bankruptcy. Nast further testified that plaintiff had been unable to collect anything on certain of the accounts, other than the Jones, Davis and Wolverine accounts, assigned to it after the execution of the contract sued on, but the evidence does not show definitely what ultimate loss, if any, plaintiff will suffer by reason of the transactions with the Kellastone Company under said contract. On the three so-called "certificates of indebtedness" introduced, evidencing the assignments to plaintiff of the Jones, Davis and Wolverine accounts, as well as many other accounts, appeared the following indorsement, signed by plaintiff by its assistant secretary, viz.: "For value received, all right, title and interest in and to this contract or claim is hereby sold, assigned and transferred to The Hibernian Banking Association, as trustee, and payment in full is hereby guaranteed." On the "certificates" dated September 2nd and September 4th, said assignments to the bank are each dated September 9, 1913, and on the "certificate" dated September 12th, said assignment to the bank is dated September 15, 1913.

At the conclusion of plaintiff's evidence, and again at the conclusion of all the evidence, the defendant moved the court to instruct the jury to find the issues for defendant, but the motions were overruled and exceptions taken.

HARRIS F. WILLIAMS, for appellant; ELDON M. VOTAW and W. SCOTT HODGES, of counsel.

RINGER, WILHARTZ, LOUER & CONCANNON, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

The main contention of counsel for defendant is that there can be no recovery by plaintiff in this case because (1) the agreement of September 2, 1913, upon which the suit is based, amounts to the pledging of certain accounts receivable to secure the repayment of money advanced, and is, therefore, a mere money loaning agreement, and not an agreement for the sale of the accounts; and, (2) it being such an agreement, the same is not only *ultra vires* the plaintiff corporation but is illegal, in that plaintiff as a corporation, organized under the General Incorporation Act of Illinois, is not permitted by its charter to loan money.

We have been favored with elaborate arguments by the respective counsel and, after careful consideration of the same and of some of the cases cited and other cases, we have reached the conclusion that the agreement in question is an agreement for the loaning of money by plaintiff to the Kellastone Company upon accounts receivable of the latter company as security, rather than on agreement for the sale of the accounts to plaintiff, and that the accounts in question in this case should rightly be considered as having been pledged with plaintiff as security for certain moneys loaned thereon to the Kellastone Company, rather than as having been sold by the Kellastone Company to plaintiff. Other agreements, much resembling the agreement in question, have been construed recently by United States courts as not being agreements for the sale of accounts but rather as agreements pledging accounts as security for money loaned, and transactions under said agreements, quite similar to the transactions here disclosed, have been considered by said courts as loans rather than sales. *In re American*

*Fibre Reed Co.,* 206 Fed. 309, affirmed in *Home Bond Co. v. McChesney,* 127 C. C. A. 552, 210 Fed. 893; *In re Grand Union Co.,* on petition of Hamilton Investment Co., a decision by the United States Circuit Court of Appeals, for the Second Circuit, opinion filed December 15, 1914. See 219 Fed. 353.

While in the agreement here in question it is stated that the Kellastone Company is desirous of "selling" to plaintiff accounts receivable and that plaintiff agrees "to buy" such of the accounts of the Kellastone Company as "are acceptable" to plaintiff, still, as it seems to us, there are many features of the agreement which characterize it as an agreement for the pledging rather than the sale of accounts. We shall make mention of some of these features: (1) In the second paragraph of the agreement the term "default or loss," as used therein is construed to mean (a) the nonpayment of an account to plaintiff at maturity, (b) insolvency of the debtor, or (c) failure or refusal of the debtor to accept, receive and retain the property evidenced by an account; and the Kellastone Company agrees to pay to plaintiff "all expenses, attorney's fees and *losses*" incurred by plaintiff in and about any account in default. This provision suggests that plaintiff will look to the Kellastone Company and not to the debtor, in the event of plaintiff's failure to realize on an account at the maturity thereof or in the event of the insolvency of the debtor, and also suggests the right on the part of plaintiff, in either of those events, to demand and enforce repayment to it from the Kellastone Company of the moneys previously advanced on said account. The conduct of the parties is in conformity with this construction. Nast testified that when the accounts in question were not paid at maturity plaintiff "made demand on the Kellastone Company for the money under the contract," and afterwards demanded that Kastor, as guarantor, "make good these losses." In 35 Cyc. 39, it is said: "If there is a right

Mercantile Trust Co. of Illinois v. Kastor, 191 Ill. App. 219.

reserved by the buyer to demand and enforce repayment the transaction is not a sale but in the nature of a mortgage." In *Robinson v. Farrelly*, 16 Ala. 472, it was held that where the vendee retains the right to demand repayment of the vendor, notwithstanding the purchase, it is conclusive to show that the transaction was intended as a security and not a sale. If it was the intention of the parties to the agreement to make a sale of such accounts of the Kellastone Company as were acceptable to plaintiff, why should the former agree to pay the latter "all expenses, attorney's fees and losses" incurred by the latter in and about any account in default? The provision appears to us as negativing any intention of a sale of the accounts. The plaintiff does not take the risk of loss on the accounts. (2) In the third paragraph of the agreement it is provided that the Kellastone Company "shall make entries upon its books disclosing the sale" of the accounts to plaintiff, and in the so-called "certificates of indebtedness," signed by the Kellastone Company at the time the accounts were assigned, the Kellastone Company "guarantees" that "entries have been made on its books disclosing the absolute sale" of the accounts to plaintiff. If there really was to be a sale of the accounts, such provisions were not needed. In the case of *Bright v. Wagle,* 3 Dana (Ky.) 252, Bright executed a writing to the effect that he had bargained and sold to Wagle "one negro boy named Daniel," for a certain sum named, and it was stated in the writing that it was understood that Bright was to have the right of "repurchasing" said boy by paying said sum by a certain date, together with twelve per cent. on the amount, and that "the negro aforesaid is to *remain in the possession of said Wagle."* In construing the writing not to be a contract for the sale of the slave, the Court said (p. 257): "There is an express stipulation * * * that the negro was to remain in the possession of Wagle. If the minds of the parties were

Mercantile Trust° Co. of Illinois v. Kastor, 191 Ill. App. 219.

not running upon a loan, and a mortgage, pledge or lien upon the slave, to secure it, why the introduction of this stipulation? If it were a sale, and so intended by the parties, no reasonable man could doubt, but that the property and immediate possession thereof would pass to the vendee, without any special stipulation to that effect." (3) In the fourth paragraph of the agreement it is provided that the purchase of accounts by plaintiff is made upon representations in writing concerning the financial responsibility of *the Kella-stone Company.* If a sale of accounts to plaintiff were contemplated plaintiff would not be concerned about the financial responsibility of the seller, but rather with the financial responsibility of the party owing the accounts. (4) In the first paragraph of the agreement it is provided that seventy-seven per cent. of the face value of the accounts shall be paid upon their acceptance by plaintiff, and that "the remainder, less all deductions," shall be paid to the Kellastone Company immediately upon payment of any such accounts to plaintiff, but there is the proviso that if, at the time of any settlement between the Kellastone Company and plaintiff, "*any* of the accounts purchased hereunder shall be in default" (i. e., not paid to plaintiff at maturity, or the party owing the account be insolvent, etc.), "payment of such remainder, while *any* of the accounts are in default, shall be discretionary" with plaintiff. We think that this means that the parties to the agreement intended that plaintiff *might* retain the balance of cash received by it on any paid account or accounts, over and above the seventy-seven per cent. thereof paid by it at the time said account or accounts were assigned to it, as long as *any* other account remained in "default," and so retain said balance as *security* on said account so in default. We do not think that these provisions, taken in connection with the other provisions contained in said first paragraph, are consistent with the idea of a sale of the ac-

counts.   In the *American Fibre Reed Co.* case, *supra,* the contract there in question had provisions very similar to the provisions in said first paragraph of the agreement here in question, and on the review of that case, in *Home Bond Co. v. McChesney, supra,* the Court said (p. 894) : ''The record discloses to us a mutual intendment that the right at least to 20 per cent. of the full value of each of the accounts receivable was always to remain in the bankrupts, except only for *purposes of security;* this right *could not be both sold and owned* by the bankrupts.''    (5)   In the ''guaranty and waiver,'' signed by defendant and others, it is stated that the undersigned jointly and severally guaranty to plaintiff the full and prompt ''payment, performance and discharge'' by the Kellastone Company of each of the provisions and conditions of the agreement, i. e., that the Kellastone Company will, among other things, pay plaintiff ''all expenses, attorney's fees and losses'' incurred by plaintiff in or about any account in default.   We think that this provision is also inconsistent with the idea of a sale of the accounts.   It suggests that the parties to the agreement intended that plaintiff should have *additional security* for the money advanced on accounts beyond the security afforded by the accounts themselves. (6)   Before the agreement was signed the evidence shows that the Kellastone Company was ''hard up'' and needed money to run its business and had applied to plaintiff for monetary assistance, and that plaintiff insisted upon defendant signing said ''guaranty and waiver'' before it would enter into the contract.   (7) There are many usurious features in the agreement, and we think that the statement of the Court in the case of *In re American Fibre Reed Co., supra,* (p. 318) relative to the contracts there in question is applicable to the agreement here in question, viz.: ''In so far as the contracts in question here use words fit for a contract of purchase, they are mere shams and devices to cover loans of money at usurious rates of interest.''

The plaintiff is a corporation organized under the General Incorporation Act of Illinois. As such a corporation it is prohibited from engaging in the "business of loaning money" (sec. 1, ch. 32, Hurd's R. S. J. & A. ¶ 2418). Holding as we do that the agreement here in question is an agreement for the loaning of money by plaintiff to the Kellastone Company, it follows, we think, that the agreement is absolutely void, that no action could be maintained thereon by plaintiff against the Kellastone Company and that the doctrine of estoppel could not apply. *In re Grand Union Co.,* *supra; Central Trans. Co. v. Pullman's Palace Car Co.,* 139 U. S. 24; *National Home Building & Loan Ass'n v.* *Home Sav. Bank,* 181 Ill. 35; *Steele v. Fraternal Tribunes,* 215 Ill. 190. And we think it also follows that no action can be maintained by plaintiff against defendant as guarantor of a void agreement. 20 Cyc. 1420.

In the "guaranty and waiver," which the defendant signed and which is on the reverse side of the paper containing the agreement between the Kellastone Company and plaintiff, it is provided that defendant guaranties to plaintiff the full, prompt and faithful payment, performance and discharge by the Kellastone Company of each of the provisions and conditions of the agreement "on the reverse side hereof, or *any other* *instrument given or executed in pursuance thereof."* In the so-called "certificates of indebtedness," signed only by the Kellastone Company when the accounts in question were assigned by it to the plaintiff, it is stated that "the undersigned hereby guarantees the payment in full" to plaintiff "of the above named contracts and open accounts in accordance with the terms indicated and appearing thereon." It is to be noticed that these instruments are not signed by the defendant, Kastor. It is here urged by plaintiff's counsel that these instruments should be considered as a part of defendant's guaranty because they are instruments "given or executed in pursuance of" said agreement,

and that this fixes the liability of defendant in this case. We cannot assent to this, for reasons stated in *American Credit & Trust Co. v. Witz,* 186 Ill. App. 184, 187. And in our opinion the decision in that case discloses other good reasons in addition to those hereinabove mentioned, why there can be no recovery in the present case against the defendant as guarantor.

In view of the foregoing, it is unnecessary for us to discuss the other points raised by counsel for defendant.

In *Harty Bros. & Harty Co. v. Polakow,* 237 Ill. 559, 567, it is said: "The Appellate Court may reverse without remanding under two conditions: First, where it finds the facts in controversy different from the finding of the trial court and recites the ultimate facts so found in its judgment; second, when it reverses for errors of law which cannot be obviated or cured on another trial." We are of the opinion that under the facts of this case the trial court erred in refusing to grant the motions of defendant, made at the conclusion of plaintiff's evidence and again at the close of all the evidence, to instruct the jury to find for the defendant, and in entering the judgment appealed from, and that there can be no recovery by plaintiff of defendant on the contract and guaranty sued upon, at any subsequent trial. The judgment of the Municipal Court will be reversed, but the cause will not be remanded.

*Reversed.*